**INGALLS SHIPBUILDING, INC., Appellant,**

v.

**Sean C. O'KEEFE, Acting Secretary of the Navy, Appellee.**

**Nos. 91–1417, 91–1444 and 91–1505.**

United States Court of Appeals, Federal Circuit.

Feb. 12, 1993.

Gregory A. Smith, Pettit & Martin, Washington, DC, argued, for appellant. With him on the brief, was Michael W. Clancy. Also on the brief, were William J. Powers, Jr. and John H. Carlson, Ingalls Shipbuilding, Inc., Pascagoula, MS, of counsel.

Joan M. Bernott, Sp. Litigation Counsel, Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued, for appellee. With her on the brief, were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen. Also on the brief, were James H. Phillips, Asst. Director, Navy Litigation Office, William A. Longwell, Naval Sea Systems Command, William E. Pressly, Conversion Repair, USN and James H. Haag, Trial Atty., Navy Litigation Office, of counsel.

Before MICHEL, LOURIE, and RADER, Circuit Judges.

MICHEL, Circuit Judge.

Ingalls Shipbuilding, Inc. (Ingalls) appeals from two decisions of the Armed Services Board of Contract Appeals (ASBCA) and from the denial of reconsideration of one of them. In ASBCA No. 38323, 91-2 BCA ¶ 23,904 (March 21, 1991), the ASBCA granted the government's motion to dismiss Ingalls' appeal for lack of subject matter jurisdiction because a proper official had not certified Ingalls' claim to the contracting officer, pursuant to Contract Disputes Act (CDA) section 6(c)(1), 41 U.S.C. § 605(c)(1) (1988), and its implementing regulation, Federal Acquisition Regulation (FAR) 33.207(c)(2), 48 C.F.R. § 33.-207(c)(2) (1991), as interpreted by *United States v. Grumman Aerospace Corp.*, 927 F.2d 575 (Fed.Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991). On appeal to the Federal Circuit, ASBCA No. 38323 was assigned Appeal No. 91-1417. Based on its reasoning in ASBCA No. 38323 and on the parties' agreement that the decision in ASBCA No. 38323 would control the disposition of ASBCA No. 40220, the ASBCA on April 19, 1991 also dismissed the latter appeal for lack of jurisdiction, 91-2 BCA ¶ 23,904, *reconsideration denied,* 92-1 BCA ¶ 24,373 (September 4, 1991). The appeal of the ASBCA's original opinion in ASBCA No. 40220 was assigned Appeal No. 91-1444 in the Federal Circuit, and the appeal of the ASBCA's reconsideration decision in ASBCA No. 40220 was assigned Appeal No. 91-1505 in the Federal Circuit.

As the three appeals involve the same certifying official and raise common issues of law, we consolidated them for decision. Because the ASBCA's determination that Ingalls did not satisfy the certification requirements was not supported by substantial evidence and was not in accordance with law, we reverse and remand Nos. 91-1417 and 91-1444 and dismiss as moot No. 91-1505.

## BACKGROUND

The dispositive facts for purposes of the instant appeals are undisputed. Mr. E.B. Robbins, Ingalls' Vice President of Administration, certified the underlying CDA claims to the Navy contracting officer. When he certified those claims, Mr. Robbins was an elected corporate vice president who reported directly to the President of Ingalls, Mr. St. Pé, at Ingalls' facilities in Pascagoula, Mississippi. The Pascagoula shipyard was the location for the performance of the contracts to construct the LHD-1 Amphibious Assault Ship, and Mr. Robbins' office was near that of Mr. St. Pé's in the Administration Building at the shipyard site.

By formal resolution of Ingalls' Board of Directors, Mr. Robbins was:

Individually authorized and empowered, without benefit of further authorization of [the] Board of Directors relative thereto, to *execute* and deliver in the name and under the seal of the Corporation, all legal documents, *contracts of routine nature,* federal, state, county and city information reports, tax returns, license, insurance and qualification applications, *judicial process and pleadings,* and to do and perform such other acts and things as may, in the regular and ordinary affairs of the Corporation be essen-

tial, appropriate and in the best interest of the corporation.

ASBCA No. 38323, 91-2 BCA ¶ 23,904, at 119, 751-52 (emphasis added). As a matter of internal company policy, however, "[a]ll contract change proposals and contract changes costing in excess of $2,000,000.00, in addition to approvals [from the Vice President of Administration and others], shall be approved by the President prior to submittal to the customer." *Id.* at 119,752.

In addition, according to Ingalls' "Functional Responsibility" statement for the Vice President of Administration, Mr. Robbins had responsibility to:

A. *Supervise and direct* the management of Contracts Administration activities which include the *negotiation* of new business *contracts and claims*, maintenance of the Contracts Correspondence Control Release System, guarantee/warranty deficiencies and Guaranty Survey negotiations, and the maintenance and publication of Company Policies, Standard Procedures and Organization Manuals.

B. Supervise and direct the management of Finance activities which include maintaining the financial systems and financial data and providing adequate and timely support to other departments.

C. Supervise and direct the management of Information Systems activities which include all automatic data processing services required to support Ingalls.

D. *Supervise and direct* the management of Estimating/Cost Engineering activities which include *contract change estimates*, overhaul estimating, budgeting, progressing and evaluating direct costs associated with material dollars and labor man-hours, and special contract-related projects.

*Id.* (emphasis added). With respect to "Contracts Administration activities," Mr. Robbins testified by deposition that it included "responsibility to help ensure that we, we the company, completely comply with our contract obligations and that we maintain our rights under the contract also." Another aspect of his responsibilities was to confirm that all contract changes and modifications are amenable to the company, the government, and technical and contract requirements.

Although Mr. Robbins attended weekly staff meetings which dealt with diverse aspects of the management of the shipyard, *id.* at 119,753, he was not directly responsible for manufacturing and engineering ships or purchasing most materials. For example, Mr. Robbins did not supervise Ingalls' employees who actually performed the construction work. Nor was he in charge of allocating capital assets to the contracts or checking work quality. Other vice presidents were responsible for these aspects of operations.

## DISCUSSION

### I.

■ The CDA defines our standard of review for decisions of agency boards of contract appeals:

[T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b) (1988). To the extent that the ASBCA's determinations turned on its interpretation of FAR 33.207(c)(2), they present questions of law subject to *de novo* review. *United States v. Boeing Co.*, 802 F.2d 1390, 1393 (Fed.Cir.1986) ("The interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve.") (citation omitted). But we cannot disturb fact findings supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brewer v. United States Postal Serv.*, 647 F.2d 1093, 1096, 227 Ct.

Cl. 276 (1981), *cert. denied,* 454 U.S. 1144, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). We must determine whether "on the record as a whole" substantial evidence supports the ASBCA's findings. *Id.* (citation omitted).

## II.

■ Under the first prong of the certification regulation, a proper certifier would be "[a] senior company official in charge at the contractor's plant or location involved." 48 C.F.R. § 33.207(c)(2)(i). The ASBCA found, and we agree it had a basis in substantial evidence, that "Mr. Robbins is a senior company official at the location involved." No. 38323, 91–2 BCA ¶ 23,904, at 119,753. As detailed above, Mr. Robbins was an elected corporate vice president who was resident at Ingalls' Pascagoula shipyard.[1] Under any standard of proof or review, he met the requirement of seniority.

Therefore, the only remaining requirement of FAR 33.207(c)(2)(i) is that Mr. Robbins be "in charge." The ASBCA found that although Mr. Robbins "was influential [and] exercised control over the business part of [Ingalls'] affairs," "[h]e had no say over construction where the claim has it [sic] roots and had no authority to submit claims ... over $2,000,000.00 without first getting approvals from others including the President." No. 38323, 91–2 BCA ¶ 23,904, at 119,754. The ASBCA then determined that Mr. Robbins was not in charge at the Pascagoula shipyard and consequently was not a proper certifying official under the first prong of the FAR.

The ASBCA, however, misconstrued the "in charge" requirement of the certification regulation as clarified in *Grumman.* To be in charge within the meaning of the FAR, a certifier need not be in charge of the plant or location, only of the contract.[2] Nor need he have direct supervisory authority over every aspect of the contract's performance, such as construction and engineering. Neither the regulation nor *Grumman* requires or even contemplates such parsing of a contractor's operations and corporate structure. But, a certifying official must have "primary responsibility for the execution of the contract." *Grumman,* 927 F.2d at 580. Therefore, the relevant inquiry is simply whether Mr. Robbins had primary responsibility for the performance of the contracts from which these claims derive.[3] Uncontroverted evidence in

1. The government points out that Mr. Robbins' office was located in a building away from the industrial area where the ships were built, and that he rarely visited the work site. Brief for Appellee at 7. Such facts, however, do not affect our analysis under the FAR. First, the regulation refers to "plant or location," a broader concept than individual buildings. The FAR also does not dictate some minimum presence at the actual work site within the plant or location. Indeed, we are not surprised that "a senior company official in charge at the contractor's plant" has an office in the Administration Building and is not "walking the lines" of the industrial area.

2. In *Universal Canvas, Inc. v. Stone,* 975 F.2d 847 (Fed.Cir.1992), this court reiterated the requirement that to satisfy FAR 33.207(c)(2)(i), the certifier must "have both primary responsibility for the execution of the contract *and* a physical presence at the location of primary contract activity." *Id.* at 849 (quoting *Grumman,* 927 F.2d at 580) (emphasis in original). The court's subsequent references in that case to "in charge *of* the contractor's plant or location," *id.* at 849 (emphasis added), and "in charge *of* the plant or location of the contract," *id.* at 850

(emphasis added), merely describe the evidence presented in *Ball, Ball & Brosamer v. United States,* 878 F.2d 1426 (Fed.Cir.1989), and *United States v. Newport News Shipbuilding & Dry Dock Co.,* 933 F.2d 996 (Fed.Cir.1991), not the legal standard, and therefore, cannot be interpreted as negating the *Grumman* requirement or creating an alternative one. In any event, the earlier case in time, *Grumman,* controls. *See Newell Cos., Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir.1988), *cert. denied,* 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

In most circumstances, an individual in charge of the plant where the contract is performed will also have primary responsibility for the contract's execution. Therefore, as a kind of short hand, panels may have referred to an individual as being "in charge of the plant" as synonymous with "in charge of the contract" because being the former was conclusive proof as to the latter.

3. We note that several pre-*Grumman* decisions of agency boards of contract appeals had construed the "in charge" language of FAR 33.-207(c)(2)(i) consistently with the *Grumman* panel. *See, e.g., Emerson Electric Co.,* ASBCA

the record indicates that he did, and the ASBCA erred as a matter of law by requiring more.

Mr. Robbins' responsibilities included supervising and directing Contracts Administration, which "[p]rovide[d] guidance to all other [personnel] on company contractual rights and obligations." He was authorized by Board resolution to "execute contracts . . . and judicial process and pleadings." ASBCA No. 38323, 91–2 BCA ¶ 23,904 at 119,751–52. He was also empowered by his job description to "supervise and direct . . . the negotiation of new business contracts and claims." *Id.* In addition to administering contract performance, Contracts Administration, under Mr. Robbins' direction, also negotiated all contracts, modifications, and claims and managed correspondence concerning contracts. As the facts of these appeals illustrate, primary responsibility for contract performance and direct supervision over all operational aspects of performance are not necessarily synonymous. While Mr. Robbins may not have had the latter, he clearly had the former.

### III.

■ That Ingalls' internal policy required the President as well as Mr. Robbins and other officials to approve claims over two million dollars is immaterial to whether Mr. Robbins was in charge of contract performance. Since both the President and Mr. Robbins must sign, the company policy reflects merely a checks and balances procedure rather than a corporate delegation of primary responsibility for contract performance exclusively to its President.

Moreover, the plain language of the FAR, which states that "[a] senior company official in charge" can certify, indicates that more than one person in a corporation may be authorized to certify claims.[4]

Nor does anything else in the record negate our conclusion that Mr. Robbins was in charge of the subject contracts at the Pascagoula shipyard within the meaning of FAR 33.207(c)(2)(i). The government, for instance, stresses that Mr. Robbins did not view himself to be in charge of the shipyard when the President, Mr. St. Pé, was present. Brief for Appellee at 7, 28. Mr. Robbins' own perception of whether or not he was in charge is simply irrelevant to our legal determination which must be based on actual, not perceived, facts. Moreover, he need not be in charge of the shipyard. There is no evidence that Mr. Robbins required prior approval of a more responsible official before "directing" contract performance.[5] Therefore, he had primary responsibility for the contracts. Trying to find gaps in Mr. Robbins' responsibility, the government further notes that Mr. Robbins did not go on sea trials and that he did not brief Navy officials at quarterly program reviews. *Id.* at 28. But those facts, standing alone, only describe specific *actions* of other employees; they

No. 37352, 91–1 BCA ¶ 23,581, at 118,223, 1990 WL 256688 (Dec. 5, 1990) (determining that Vice President, Administration who: (1) set contracting policy, (2) could sign contracts and file claims, and (3) had broad managerial oversight and responsibilities such as contract negotiations and administration was a proper certifier); *Southwest Marine, Inc.,* ASBCA No. 33208, 88–3 BCA ¶ 20,982, at 106,016, 1988 WL 81090 (July 11, 1988), *reconsideration denied,* 89–1 BCA ¶ 21,197, 1988 WL 104161 (Sept. 16, 1988) (determining that manager of contracts with unlimited contractual authority who was responsible for assisting with general management of company and with managing of company's cash flow, running the contract department, and negotiating change orders, was a proper certifying official); *Tracor, Inc.,* ASBCA No. 29912, 87–2 BCA ¶ 19,808, at 100,184, 1987 WL 40877 (Apr. 24, 1987) (determining that Director of Con-

tracts with responsibility for company's contracting activities, including claim preparation and submission, satisfied FAR 33.207(c)(2)(i)).

4. At least two Board opinions have acknowledged that this part of the FAR can refer to multiple officials. *See In re McDonnell Douglas Missile Systems Co.,* ASBCA No. 37712, 91–3 BCA ¶ 24,342, 1991 WL 186173 (1991); *In re Emerson Electric Co.,* ASBCA No. 37352, 91–1 BCA ¶ 23,581, 1990 WL 256688 (1990).

5. On one modification, the record shows that Mr. Robbins negotiated contract changes within cost and profit parameters Ingalls' parent company had established. Although Mr. Robbins kept Mr. St. Pé advised of the negotiations, he nevertheless had primary responsibility for performance of the contracts on behalf of Ingalls, including contract changes.

prove nothing about who has *primary responsibility* for contract performance—the pertinent inquiry under FAR 33.207(c)(2)(i). Accordingly, substantial evidence does not support the ASBCA's determination that Mr. Robbins did not satisfy FAR 33.207(c)(2)(i) as correctly construed. Lacking substantial evidence, the ASBCA erred by dismissing Ingalls' appeals for lack of subject matter jurisdiction.

### IV.

■ Our conclusion that Mr. Ingalls satisfies the FAR is consistent with the legislative history of the CDA. In addition to intending that the certifier be able to bind the company under contract law, Congress clearly intended that the certifier also bind the company under civil fraud statutes. S.Rep. No. 1118, 95th Cong.2d Sess. 7–8 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5235, 5241–42 [hereinafter *Senate Report*] (relying on Admiral Hyman Rickover's testimony before two Senate subcommittees). Before the subcommittees, Admiral Rickover stated that the CDA should require "the contractor [to] submit to the Government a certificate signed by a *senior responsible contractor official*, which states that the claim and its supporting data are current, complete and accurate." *Contract Disputes Act of 1978: Joint Hearings on S. 2292, S. 2787, and S. 3178, Before the Subcomm. on Federal Spending Practices and Open Government of the Senate Comm. on Governmental Affairs and the Subcomm. on Citizens and Shareholders Rights and Remedies of the Senate Comm. on the Judiciary,* 95th Cong., 2d Sess. 21 (1978) [hereinafter *Joint Hearings*] (emphasis added). In a section of its report entitled, "Discouraging the unwarranted submission of contractor claims," the Senate Committee said that, according to Navy witnesses, a "substantial number of these outstanding claims were greatly inflated." *Senate Report* at 8, *reprinted in* 1978 U.S.C.C.A.N. at 5242. The Committee then noted: "In fact, some have been turned over to the Justice Department for *investigation of fraud." Id.* (emphasis added). It then said: "Section 4(b) of the act is designed to specifically address the inflated claim problem by assigning *stiff penalties* to contractors who engage in such practice. *Id.* (emphasis added). The "penalties" referred to are for civil fraud, including under the False Claims Act, 31 U.S.C. § 231 et seq., which is specifically mentioned in the Committee report. *Id.* at 20, *reprinted in* 1978 U.S.C.C.A.N. at 5254. In addition, section 4(b) itself allows the government to sue contractors for fraud. Hence, it is beyond serious argument that Congress intended the CDA to deter and redress fraud. Indeed, this court recently restated our precedent that the FAR requirement fosters that intent: "The [FAR] requirement goes to the very 'integrity of the federal procurement system and the public fisc,' *Universal Canvas, Inc. v. Stone,* 975 F.2d 847, 850 (Fed.Cir.1992), by 'triggering a contractor's potential liability for a fraudulent claim under section 604 of the Act and thus discouraging the submission of unwarranted contractor claims,' *Ball, Ball & Brosamer,* 878 F.2d at 1429 (quotations, alterations, and citations omitted)." *Kiewit/Tulsa–Houston v. United States,* 981 F.2d 531, 533 (Fed.Cir.1992).

Low-level officials, although often able to bind the corporation in contract, could not inculpate a corporation in the context, for example, of large shipbuilding or other defense contracts. Yet these were the very contracts concerning which Congress most wanted to deter fraudulent claims. By appointing a low-level official to certify claims, a large contractor could escape liability for fraud. Deterrence would fail. Therefore, the desired deterrence can only work if the certifier is senior enough and involved enough in contract performance to make the corporation itself liable for fraud.

That Congress wanted not only deterrence but also liability is clear. Hence, the discussion of "stiff penalties" and the Committee's assertion that under section 4(b) a fraudulent contractor "shall be liable to the Government...." *Senate Report* at 19, *reprinted in* 1978 U.S.C.C.A.N. at 5253. Indeed, our precedent has long recognized that Congress saw the two working hand-in-hand. *See Skelly and Loy v. United*

*States,* 685 F.2d 414, 418 n. 11, 231 Ct.Cl. 370 (1982) (stating that the certification requirement "triggers a contractor's potential liability for a fraudulent claim under section 604 of the Act"); *Folk Constr. Co. v. United States,* 226 Ct.Cl. 602, 1981 WL 21438 (1981) (stating that "[t]he purposes of the certification requirement are to discourage the submission of unwarranted contractor claims and to encourage settlement").

The Admiral's emphasis on "a senior responsible contractor official" implies that more was involved than whether the certifier had mere personal knowledge of all the details. Indeed, most of the Admiral's testimony concerned contractor fraud against the government; he analogized contractor certification to taxpayer certification. In both cases, a senior official must sign if the corporation is to be held accountable. After testifying at length about the fraud problem, "Admiral Rickover ... submitted written suggestions for amending the Act, which were reprinted in the report of the hearings in the middle of his testimony and which were substantially similar to the actual language of sections 6(c)(1) and (2)." *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352, 355, 230 Ct.Cl. 11 (1982). The Admiral's written suggestions stated that the bill should be amended, as it was, to provide that:

> For claims of more than $50,000, the contractor shall certify that the claim and supporting data are current, complete and accurate when the claim is submitted, and also certify that the conclusion in the claim accurately reflects the contract adjustment for which the contractor believes the Government is liable.

*Joint Hearings* at 13.

Admiral Rickover wanted to deter contractors from filing inflated claims which cost the government substantial amounts to defeat. He sought to do so by subjecting contractors to financial risk if their claims were unreasonable. [Citation omitted.] Admiral Rickover viewed the certification requirement as a necessary prerequisite to the consideration of any claim. The provisions Congress adopted to include the certification requirement were based upon Admiral Rickover's written suggestions and fairly must be deemed to have incorporated his view concerning the effect of the certification requirement.

*Lehman,* 673 F.2d at 355.

As discussed above, the legislative history conclusively established that fraudulent claims were at the core of Rickover's and Congress' concerns. As noted, requiring a high-level official to sign the certification would deter fraud because by his signature such officer would expose the corporation to potential liability under civil fraud statutes. Such exposure was the paramount motivation for the addition to the CDA of the certification requirement by amendment on the Senate floor on the day of its passage. *See* 124 Cong.Rec. 36,267 (1978) (stating that section 5(c) of the Act, which includes the certification requirement, "has been amended due to the concerns expressed by ... Admiral Rickover...."). This purpose is plainly well served by the FAR which requires certification for corporations by a high-level official rather than merely any employee with authority to bind the corporation in contract. The FAR does no more than demand Admiral Rickover's "senior responsible contractor official." It is therefore entirely consistent with the legislative history that illuminates Congressional intent in adding the certification requirement.

An analysis of the FAR in light of Congressional intent shows that the FAR is perfectly consistent with that intent. That analysis is set forth in *Grumman,* 927 F.2d at 578–79. We concluded that the FAR provision "is entirely consistent with the statutory section here involved, merely serving to fill the gap implicitly left by Congress...." *Id.* at 578. The statute itself merely states that "the contractor shall certify," 41 U.S.C. § 605(c)(1), and defines "contractor" to mean "a party to a Government contract other than the Government." 41 U.S.C. § 601(4). Since a corporation itself cannot sign, some representative must. Because the statute does not explain who may certify on behalf of a corporation, the FAR fills the gap:

If the contractor is not an individual, the certification shall be executed by—

(i) A senior company official in charge at the contractor's plant or location involved; or

(ii) An officer or general partner of the contractor having overall responsibility for the conduct of the contractor's affairs.

48 C.F.R. § 33.207(c)(2). Clearly, the FAR in no way conflicts with any language in section 605.

The only question left is whether the language is inconsistent with "clearly discernible legislative intent" not apparent in the statute itself. *True v. Office of Personnel Management*, 926 F.2d 1151, 1155 (Fed.Cir.1991) (quoting *Beneficial Corp. v. United States*, 814 F.2d 1570, 1574 (Fed. Cir.1987) (quoting *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir. 1986))). For the reason discussed *ante*, we conclude, as we did in *Grumman* and in *Ball, Ball & Brosamer*, that it is not. *See Grumman*, 927 F.2d at 578–79; *Ball, Ball & Brosamer*, 878 F.2d at 1428–29. The senior officials specified in the regulation bind the corporation both in contract and fraud. As Congress intended the certification requirement to satisfy both of these goals, the regulation serves rather than subverts Congressional intent.

### CONCLUSION

Since we hold that Mr. Robbins was a proper certifying official under FAR 33.-207(c)(2)(i), we express no opinion on the other issues that Ingalls raised on appeal. For the reasons stated above, the decisions of the ASBCA in No. 38323, 91–2 BCA ¶ 23,904 and in its companion, No. 40220, are reversed and remanded for adjudication on the merits as the ASBCA does have jurisdiction because the certification by Mr. Robbins did meet the requirements of the FAR. The appeal from the decision of the ASBCA denying reconsideration in No. 40220, 92–1 BCA ¶ 24,373, is dismissed as moot.

REVERSED–IN–PART, REMANDED–IN–PART, AND DISMISSED–IN–PART.

COSTS

Costs are awarded to the contractor.