**MEDINA CONSTRUCTION, LTD., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–194C.**

United States Court of Federal Claims.

April 20, 1999.

---

Robert L. Duston, Washington, DC, attorney for plaintiff. Mark I. Gruhin, Daniel R. Weckstein, Mark T. Coberly and William M. Dozier, of counsel.

Terry M. Petrie, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Bryan R. O'Boyle, Department of the Air Force, AFL-SA/JACN, of counsel.

## OPINION

MEROW, Judge.

This matter is before the Court upon: (1) plaintiff's motion for a stay of the proceedings; and (2) plaintiff's request for dismissal of its action, without prejudice, based upon this Court's lack of jurisdiction. This case had its genesis in a contract with plaintiff, a Canadian corporation, to repair a hangar located at Lajes Field, on the island of Terceira in the Azores Islands off the coast of Portugal. The government determined to end activities under the contract by means of a termination for convenience. Plaintiff then submitted a termination settlement proposal ("TSP") pursuant to the terms of the contract and the Contract Disputes Act of 1978

("CDA"), 41 U.S.C. §§ 601–613 (1994).[1] The government claims it was precluded from negotiating a settlement of the termination costs by its own investigation into allegations that Medina had defrauded the government. Nevertheless, the contracting officer ("CO") determined that a CDA claim had arisen and issued a final decision denying plaintiff's request for costs contained in the TSP. Plaintiff filed a complaint in this Court in response to which the government raised counterclaims sounding in fraud.

Approximately fifteen months prior to filing its complaint in this Court, and prior to the issuance of the CO's final decision, plaintiff filed a complaint in a Portuguese Court against both the United States and Portugal seeking to recover the sums set forth in the TSP. Plaintiff now contends this case is properly venued in Portugal and has moved for a stay of all proceedings in this Court pending a decision by a Portuguese Tribunal. The government opposes plaintiff's motion for a stay.

After oral argument the parties filed supplemental briefs addressing this Court's jurisdiction over the matter pursuant to the CDA. Plaintiff argues that jurisdiction is inappropriate in this Court because its TSP did not ripen into a CDA claim and any final decision by the CO was improperly issued. Defendant opposes this argument and contends that the TSP ripened into a claim appropriate for the CO's determination. Further, the government asserts that the CO's final decision was appropriate and argues that this Court has jurisdiction over the matter.

For the reasons stated below, it is concluded that this Court lacks jurisdiction over plaintiff's claims and the complaint must be dismissed in its entirety. Accordingly, defendant's counterclaims must also be dismissed. Finally, plaintiff's motion for a stay of the proceedings is dismissed due to this Court's lack of jurisdiction.

## BACKGROUND

### Facts

Terceira Island is one of nine islands in a Portuguese archipelago known as The

1. The 1994 version of the United States Code is relied upon, unless otherwise indicated.

Azores. Located in the Atlantic Ocean approximately 900 miles west of Lisbon, the Lajes Air Base ("Lajes") on Terceira was an integral part of air operations as well as the Allies' anti-submarine campaign during World War II. Lajes still serves a role in the defense of the Atlantic region today.

The following facts are undisputed except as otherwise noted. In September 1991, plaintiff Medina Construction, Ltd., a Canadian enterprise,[2] was awarded Contract No. F61040–91–C001 for the repair and maintenance of a United States Air Force ("USAF") "joint use"[3] hangar at Lajes. The parties agreed to a fixed contract price of $2,919,705.00 and an anticipated completion date of September 30, 1992.

During the performance of the contract Medina allegedly incurred additional and unexpected costs as a consequence of the remote location of the project, the discovery of the environmental hazard "red lead," and other delays and change orders. The elevated expenses and subsequent contract modifications were apparently discussed between the parties and in April 1993 Medina threatened to suspend work unless certain progress payments were made.

Pursuant to their agreement, the USAF had agreed to pay a portion of Medina's cost of materials. Any remaining material costs were to be paid through progress payments as the goods were incorporated into the project. Medina was required to support its payment requests with certified vendor invoices, inventory checklists and accepted delivery tickets. The government alleges that during the course of the contract, Medina submitted and was paid upon twenty-three certified material vendor invoices. Twenty-one of these invoices were provided by one

supplier, Confianca Export Company ("Confianca"). The government claims that five of the invoices submitted on Confianca letterhead used a different typewriter font than others from the same supplier. It is alleged that these five invoices were forgeries which resulted in an overpayment of $231,980.00 to Medina. In May 1993 the USAF Office of Special Investigation ("OSI") considered the matter and ultimately concluded that the fraud allegations alone could not justify terminating the contract for cause.

### The Termination for Convenience

On or about July 30, 1993 the CO informed Medina that the contract was being terminated for the convenience of the government.

The contract between Medina and the USAF incorporated FAR § 52.249–2 (ALT I) (April 1984), "Termination for Convenience of the Government (Fixed Price)," which provided in pertinent part:

(d) After termination, the Contractor shall submit a final termination settlement proposal to the [CO] in the form and with the certification prescribed by the [CO] . . .

(e) Subject to paragraph (d) above, the Contractor and the [CO] may agree upon the whole or any part of the amount to be paid because of the termination . . .

\* \* \*

(i) The Contractor shall have the right of appeal, under the Disputes clause, from any determination made by the [CO] . . .

48 C.F.R. § 52.249–2 (1993).[4]

Accordingly, on June 24, 1994, plaintiff submitted a termination settlement proposal

---

**2.** For purposes of the pending motions, it is presumed that, if applicable, those provisions of the Federal Acquisition Regulations ("FAR") (and any treaty or memorandum of agreement germane to this matter) which regulate contracting activities with contractors located in Canada have been satisfied. *See, e.g.,* 48 C.F.R. § 225.870–2 (1991) (referring to potential involvement of Canadian Commercial Corporation ("CCC") in contracts with contractors located in Canada).

**3.** There is apparently a dispute between the parties regarding the meaning of the term "joint

use." The government asserts the hangar was intended for use by both the USAF and the United States Department of the Navy. Plaintiff contends that the facility is owned by Portugal and leased to the USAF and that the hangar was intended for use by both USAF and Portuguese forces. However, this issue is immaterial to the pending motions and need not be resolved at this time.

**4.** The 1993 version of the Code of Federal Regulations is relied upon, unless otherwise indicated.

("TSP"), utilizing standard form SF1436, certified by Medina's President, Mr. Owen Crossan, seeking $1,261,149.00. 48 C.F.R. § 49.602–1(b). Medina also requested partial payment of $945,764.00 at that time.

The Defense Contract Audit Agency ("DCAA") determined that it was unable to conduct the necessary audit of plaintiff's claim in Canada. *See* 48 C.F.R. § 49.107(a) (requiring CO to "refer each prime contractor settlement proposal of $100,000.00 or more to the appropriate audit agency for review and recommendations"). However, it was agreed that Medina would submit its books and records for audit in Canada through the Canadian Commercial Corporation ("CCC"). CCC hired Consulting and Audit Canada ("CAC") to conduct the audit. In February 1995 the audit commenced but soon came to a halt because CAC found that Medina had not maintained a general ledger and associated subsidiary ledgers. Accordingly, CAC declared Medina's records unsatisfactory and insisted they be reorganized. Medina employed a Certified Public Accountant licensed in the United States to coordinate and assemble the records in the desired format. In July 1995 CAC completed its review of Medina's reorganized records.

On or about April 4, 1996 CAC issued a written report concluding that its auditors were "unable to express an opinion on the costs presented in ... [Medina's] Settlement Proposal and whether these costs ... [were] presented fairly in accordance with generally accepted accounting principles." App. to Def.'s Supplemental Br. on Ct.'s Jurisdiction ("Def.App.") at 66–67. On April 9, 1996 the CO advised Medina of CAC's findings and requested that any rebuttal be submitted on or before April 15, 1996.[5] On April 16, 1996 the USAF advised Medina that future negotiations would be arranged by the CO. Def. App. at 75.

On July 2, 1996 Medina submitted a revised TSP invoice claiming an outstanding balance of $1,718,230.50. The types of costs sought and the listing of payments received in this amended invoice paralleled the information submitted in Medina's TSP dated June 24, 1994.

By letter dated July 26, 1996 Medina's attorneys contacted the United States Ambassador in Portugal in an apparent effort to pressure the government into making payment on Medina's July 2, 1996 TSP invoice. Medina offered to settle the matter for $1,650,000.00, contingent upon receipt of payment on or before September 30, 1996. In that same correspondence Medina threatened to litigate the matter before the courts in Portugal if payment was not made.

On August 26, 1996, over two years after Medina's original TSP was submitted to the government, the parties still had not made any visible progress toward commencing negotiations. On that date, Medina transmitted a facsimile message to the USAF in which it again demanded payment on the TSP invoice.[6] Plaintiff also stated that "[Medina] herewith demand[s] ... [a] final decision on the payment of ... [the] Invoice submitted to ... [the CO] in April 1996." Def.App. at 84. Moreover, Medina "advised that ... [they were giving] notice ... [of a demand for] interest on the amount of funds due to Medina, effective September 1, 1996." Def.App. at 84.

On September 16, 1996 OSI informed the CO that the Department of Justice ("DOJ") would not pursue allegations of fraud against Medina due to a "lack of prosecutive [sic] jurisdiction and because the Portuguese legal system had declined prosecution." Def.App. at 81.

On October 9, 1996 Medina sent another letter to the USAF reiterating its intention to begin calculating interest upon the amount requested in the TSP as of September 1,

**5.** A question of fact exists regarding the submission of Medina's rebuttal. Medina claims to have forwarded the appropriate documents by e-mail on April 15, 1996. The USAF claims not to have received Medina's rebuttal until June 1996. Again, this dispute is noted but need not be resolved at this time as it is not material to the pending motions.

**6.** A facsimile transmission heading indicates the document was transmitted on August 26, 1996, but it is not clear from the documents submitted whether the CO actually received the document on that date.

1996. On October 22, 1996 Medina provided the USAF with another copy of the August 26, 1996 facsimile. On October 25, 1996 the USAF informed Medina that the CO then had "sufficient information to process the settlement claim." Def.App. at 87. The CO seemed to be undecided about whether he would issue a final decision. In a November 6, 1996 letter to Medina, the CO wrote that Medina's request for a final decision was denied and the USAF would "respond to . . . [Medina] by 30 Nov. 96 relative to termination claim settlement." Def.App. at 85. On November 14, 1996 Medina requested an explanation of the denial of the request for a final decision. But on November 22, 1996 the CO responded that his "final decision would be made when all determinations, reviews and coordination efforts are complete." Def.App. at 89. Furthermore, the CO stated that "due to the temporary absence of some personnel involved in the coordination on . . . [Medina's] proposed settlement claim, the CO's decision must . . . be delayed to on/or [sic] about 16 Dec. 1996." Def.App. at 89.

## The Lawsuit in Portugal

In November 1996 negotiations still had not commenced and Medina filed suit against the United States and Portugal in the Tribunal Court of Portugal in Praia Da Vitoria, Terceira, Portugal (Docket No. 278/96). Medina argued that the United States had failed, after the termination of the contract, to pay the costs outlined in the TSP in the amount of $1,718,230.50. DOJ apparently argued to the Portuguese Court, on behalf of the government, that Medina's claims against the United States should be dismissed because, pursuant to the doctrine of sovereign immunity, Portugal lacked jurisdiction over the United States. In addition, DOJ raised the government's allegations of fraud against Medina as an affirmative defense.

Medina asserted a separate claim against the nation of Portugal alleging that pursuant to a treaty between the United States and Portugal, Portugal is jointly and severally liable for the costs of construction, equipping [sic] and maintenance of joint facilities. See Def.'s Opp'n to Pl.'s Mot. for Stay at Attach. A. Attorneys on behalf of Portugal argued the allegations should be dismissed for lack of jurisdiction pursuant to the Portuguese Code of Civil Procedure.[7]

## The CO's Final Decision

Apparently unaware of the action commenced in the Portuguese Tribunal, in a letter dated December 23, 1996, the CO thanked Medina for its continued patience and promised that a response to the TSP would be provided by February 10, 1997. On January 21, 1997 the USAF sent a letter to Medina stating that the "reply to [Medina's] settlement proposal [was] near completion" and would be issued when coordination and review efforts were complete. Pl.'s Supplemental Br. on Ct.'s Jurisdiction ("Pl.'s Br.") at Ex. B.

On February 24, 1997 Medina inquired about the status of the CO's decision. On February 27, 1997 the CO responded that the "reply to [Medina's] proposal request regarding the status of the TSP was undergoing legal review." Pl.'s Br. at Ex. C.

Then, on March 26, 1997, the CO issued a final decision which concluded that since Medina had "submitted apparently fraudulent invoices . . . [Medina was] in breach of the contract and . . . thus not entitled to the additional payments . . . under the contract." Pl.'s Br. at Ex. D. In addition, the CO determined that based upon the allegedly "fraudulent invoices, [Medina's] claim . . . [was] subject to forfeiture under the Forfeiture of Claims Act." Pl.'s Br. at Ex. D. Further, the CO claimed that Medina's termination for convenience claim was "unsupported." Pl.'s Br. at Ex. D. This assertion was apparently based upon the auditor's claim that an opinion could not be reached on the costs presented in the TSP since the contractor had failed to maintain a general ledger and associated subsidiary ledgers. Pl.'s Br. at Ex. D.

7. Specifically, Portugal asserted that the contract (1) was a private contract entered into only between the plaintiff and authorities of the United States, and (2) not subject to suit because the only nexus with the contract was that the buildings were located in Portugal. Portugal's Answer also raised the defense of the absence of prior authorization by the Portuguese Ministry of Defense to enter into the contract. Plaintiff intimated in its briefs and at oral argument that failure to obtain proper authorization may render the contract void.

On March 23, 1998, nearly twelve months after the CO's decision was issued, Medina commenced this action by filing a complaint in the Court of Federal Claims. Given the one year statute of limitations for filing suit after a CO decision, the timing of plaintiff's filing in this Court was clearly triggered by the CO's final decision and there is no basis for interpreting this complaint as commencing from a deemed denial. 41 U.S.C. § 609(a)(3).

### Procedural History in U.S. Court of Federal Claims

In the complaint filed in this Court, naming only the United States as defendant, Medina calculated its damages as $1,718,-230.50, representing the amount of the costs outlined in the TSP invoice dated July 2, 1996. In support of its allegations that it has not been paid upon the TSP plaintiff raises the following twelve causes of action: (1) failure to pay for changed and added work; (2) failure to pay amounts due under the TSP; (3) anticipatory breach of contract; (4) failure to pay earned progress payments; (5) breach of duty to cooperate; (6) request for payment of attorneys fees; (7) violation of the Administrative Procedure Act; (8) *quantum meruit;* (9) taking of property without just compensation; (10) equal protection; (11) denial of Due Process; and (12) violation of the First Amendment. Further, the complaint alleges the government wrongfully initiated a debarment proceeding against Medina and Mr. Crossan, individually which resulted in a determination that, effective March 6, 1997, both Medina and Mr. Crossan were debarred.

Defendant served an answer which generally denied the allegations raised by plaintiff and interposed the following three counterclaims sounding in fraud: (1) forfeiture of Medina's claim in its entirety pursuant to 28 U.S.C. § 2514 and based upon the submission of false claims with the intent to deceive the government into paying more than the amount to which Medina knew it was entitled under the contract; (2) liability pursuant to the anti-fraud provisions of the CDA due to allegedly unsupported portions of the termination settlement claim, 41 U.S.C. § 604; and (3) liability pursuant to the False Claims Act based upon allegations that Medina knowingly presented, or caused to be presented, false or fraudulent claims to officers or employees of the United States, 31 U.S.C. §§ 3729–33. Medina answered the counterclaims with general denials and affirmative defenses.

Plaintiff has moved to stay the proceedings, or in the alternative, to dismiss the case for lack of jurisdiction. Medina argues that the correct forum for this action is in Portugal and asserts that it never intended to litigate the matter in this Court. Further, the action in this Court is claimed to have been filed as a "protective appeal" from the CO's final decision in order to preserve the causes of action in this Court from preclusion under the statute of limitations in the event the Tribunal in Portugal determines it does not have jurisdiction over the claims against the United States.

Oral argument was held on September 28, 1998. As jurisdiction over the matter is a prerequisite for the granting of any relief requested, the parties were questioned as to whether the TSP had properly matured into a CDA claim such that an action could appropriately be commenced here. Transcript of Oral Argument ("Tr.") at 24. Further a question was raised as to whether the CO's decision was authorized, given that it was apparently primarily based upon allegations that Medina submitted fraudulent invoices. Tr. at 25, 26. An Order was issued directing the parties to provide additional briefs, covering the Court's jurisdiction over this matter pursuant to the CDA, in order to determine whether consideration of plaintiff's motion for a stay could be undertaken.

The government asserts that Medina's TSP ripened into a claim and gave rise to the CO's final decision. Therefore, the government argues, this Court has jurisdiction over Medina's complaint and the counterclaims pleaded. In opposition, Medina submits that jurisdiction is lacking because its TSP did not ripen into a valid CDA claim and, therefore, absent a prior claim, the CO's final decision was both improper and ineffectual.

## DISCUSSION

### I. Subject Matter Jurisdiction

Pursuant to the Tucker Act, "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

■ Plaintiff commenced this action pursuant to the CDA. Under the provisions of the CDA, Congress has granted this Court jurisdiction over direct actions on claims commenced within twelve months of a CO's final decision. 41 U.S.C. § 609(a). Accordingly, under the provisions of the CDA, jurisdiction in this Court requires, as a prerequisite, both a valid "claim" and a sound "final decision" upon that claim by the CO. *James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541–42 (Fed.Cir.1996).

### A. A Valid CDA Claim Arose From the TSP

The CDA was enacted by Congress to serve as a means of resolving certain disputes related to public contracts between contractors and the government. 41 U.S.C. § 605(a). The purposes of the CDA as enacted are to "help to induce resolution of more contract disputes by negotiation prior to litigation; equalize the bargaining power of the parties when a dispute exists; provide alternative forums suitable to handle the different types of disputes; and insure fair and equitable treatment to contractors and Government agencies." S.Rep. No. 1118, 95th Cong.2d Sess. 7–8 (1978), *reprinted in* 1978 U.S.C.A.N.N. 5235, 5235; *see Pasteur v. United States,* 814 F.2d 624, 627 (Fed.Cir. 1987) (discussing purpose of CDA and its legislative history); *Oroville–Tonasket Irr. Dist. v. United States,* 33 Fed.Cl. 14, 23 (1995).

The CDA does not offer a precise definition of what constitutes a claim. Therefore, the Court must evaluate each factual situation as a whole in order to determine whether a valid CDA claim has arisen. *See Transamerica Ins. Corp. v. United States,* 973 F.2d 1572, 1578–79 (Fed.Cir.1992) (applying "logical, common sense analysis" to find contractor's submissions qualified as CDA claims) *overruled on other grounds by. Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir.1995).

To achieve the stated purposes of the CDA, "all claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the CO for a decision." 41 U.S.C. § 605(a). In addition, claims in excess of $100,000.00 must be certified. 41 U.S.C. § 605(c)(1).[8] The FAR offers further guidance, stating that a claim must be: (1) a written demand or assertion, (2) seeking as a matter of right, (3) the payment of money in a sum certain. 48 C.F.R. § 33.201; *Ellett,* 93 F.3d at 1542.

■ However, a claim need not be "in dispute" when submitted. *Reflectone, Inc. v. Dalton,* 60 F.3d 1572, 1583 (Fed.Cir.1995). Rather, the first written demand for payment as a matter of right, which is not merely a routine request, may be recognized and treated as a CDA claim. *Id.* A TSP is not a routine request for payment and has been held to fulfill the technical requirements of a CDA claim. *Ellett,* 93 F.3d at 1543; *Reflectone,* 60 F.3d at 1577–78 (distinguishing routine from non-routine submissions).

Medina's contract with the government incorporates language from the FAR expressly anticipating that in the event the parties could not agree upon a settlement, the TSP would ripen into a [CDA] claim requiring the CO to issue a unilateral settlement determination. *See* 48 C.F.R. § 49.109–7(d)(1993)(describing duties of CO pursuant to settlement by determination); 48 C.F.R. §§ 52.249–2(i) (ALT I) (April 1984) ("Contractor shall have right of appeal under the disputes clause, from any determination made by [CO]."); *Ellett,* 93 F.3d at 1544–45 ("nor is there a requirement that the settle-

---

8. In 1994 the monetary guideline for certification of a CDA claim was raised from $50,000.00 to $100,000.00. Pub.L. No. 103–355, 108 Stat.

3322 (codified as amended 41 U.S.C. § 605(c)(1)).

ment proposal be converted into a claim ... the FAR envisions a direct appeal of the [CO]'s determinations.").

■ Medina appears to have technically complied with the requirements for a CDA claim through its June 24, 1994 submission, in writing, of a TSP asserting that it was, as a matter of right, entitled to compensation for losses incurred as a result of the termination for convenience in the amount of $1,261,149.00. By July 2, 1996 the TSP costs had been upwardly amended to $1,718,230.50.

The government asserts that Medina's TSP ripened into a claim and gave rise to the CO's final decision. In opposition, Medina contends that its TSP did not ripen into a CDA claim because (1) Medina never certified the claim, and (2) negotiations never commenced which would lead the parties to reach an impasse which might have triggered conversion of the settlement proposal into a CDA claim. Each of these arguments is addressed in turn below.

### 1. Certification Requirement

A contractor submitting a CDA claim in excess of $100,000 is required to certify that (1) the claim is made in good faith; (2) the supporting data is accurate and complete to the best of his knowledge and belief; (3) the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable; and (4) the certifier is duly authorized to certify the claim on behalf of the contractor. 41 U.S.C. § 605(c)(1).

■ The purpose of certification is to facilitate settlements based upon a truthful submission of the contractor's costs. *Ingalls Shipbuilding, Inc. v. O'Keefe*, 986 F.2d 486, 491–93 (Fed.Cir.1993) (detailing legislative history behind certification requirement). Certification discourages the submission of fraudulent or inflated claims by making contractors liable for fraudulent representations. *J & E Salvage Co. v. United States*, 37 Fed.Cl. 256, 263 (1997), *aff'd*, 152 F.3d 945 (Fed.Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998); *Fischbach and Moore Int'l Corp. v. Christopher*, 987 F.2d 759, 763 (Fed.Cir.1993)(determining

that certification requirement "trigger[s] a contractor's potential liability for a fraudulent claim under section 604 of the [CDA]") (citation omitted).

■ A proper certification must contain a statement which simultaneously makes all of the assertions required by 41 U.S.C. § 605(c)(1). *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 407, 677 F.2d 850 (1982). However, "[e]xact recitation of the language of 605(c) is not required [for a valid CDA certification]." *Fischbach and Moore Int'l Corp.*, 987 F.2d at 763; *Heyl & Patterson, Inc. v. O'Keefe*, 986 F.2d 480, 483 (Fed. Cir.1993), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir.1995). Rather, substantial compliance with the statutory requirements suffices. *Heyl & Patterson, Inc.*, 986 F.2d at 483. Technical deficiencies in a certification may be corrected at any time before final judgment is entered. 41 U.S.C. § 605(c)(6). Therefore a technically deficient certification neither prevents a contractor from stating a claim nor precludes this Court's jurisdiction over the matter. *Hamza v. United States*, 31 Fed.Cl. 315, 323 (1994) (describing means of correcting technically defective certifications pursuant to CDA). A complete failure to provide a certification at all may not be deemed a defective certification. 48 C.F.R. § 33.201. This would prevent a TSP from maturing into a claim and, in the absence of a claim, this Court would lack jurisdiction over the matter. *Pevar Co. v. United States*, 32 Fed.Cl. 822, 825 (1995); *Hamza*, 31 Fed.Cl. at 324.

Medina asserts that it unilaterally prevented a CDA claim from arising because although the TSP was itself certified, the contractor refused to further certify it as a CDA claim. This argument is unpersuasive in light of the expectation, under both the contract and the FAR, that a properly certified TSP would, if settlement was impossible, ripen into a CDA claim. *See Ellett*, 93 F.3d at 1544–45.

■ The certification executed by Medina, pre-printed on the TSP form SF 1436, contains similar language to that required for a

CDA certification.[9] *Id.* at 1545–46 (comparing 48 C.F.R. § 53.301–1436 to 41 U.S.C. § 605(c)(6)); *see also Appeal of Metric Constructors, Inc.,* ASBCA No. 50843; 98–2 B.C.A. ¶ 30,088, 1998 WL 758397 (Oct. 27, 1998) (departing from prior holding and finding language of SF1436 certification to be correctable to comply with certification language required by CDA). Although Medina subsequently amended the amount asserted to be due under the TSP, it is conceded that the types of costs sought and the listing of payments received in this amended invoice paralleled the information submitted in Medina's original TSP dated June 24, 1994. Certification does not bar proof of higher damages and recertification is not required. *Tecom, Inc. v. United States,* 732 F.2d 935, 937 (Fed.Cir.1984); *J.F. Shea Co., Inc. v. United States,* 4 Cl.Ct. 46, 54–55 (1983).

Medina does not argue against the veracity of the costs submitted in its TSP, nor does the contractor contend that the proposal was inaccurate or incomplete, or was not certified in good faith. Nor does Medina recant its assertions that it has not submitted inflated or fraudulent costs. Doing so would certainly defeat any effort at settlement of the claim under the CDA. Rather, Medina expressly agreed that the costs were "prepared with the knowledge that they will, or may, be used directly or indirectly as the basis of a ... claim against an agency of the United States." Def.'s App. at 10. Moreover, having failed to settle the TSP, Medina has, as anticipated by the FAR, introduced its TSP

directly into litigation. *Ellett,* 93 F.3d at 1545.

█ Accordingly, without more, Medina's refusal to provide a new certification does not preclude the previously executed [10] and certified TSP from ripening into a CDA claim within this Court's jurisdiction. *See, e.g., D.L. Braughler Co., Inc. v. West,* 127 F.3d 1476, 1483 (Fed.Cir.1997)(holding that after presentation of certified letter seeking costs to government official other than CO, no new certification was required upon submission of identical claim and supporting data to CO). The Court may direct the correction of any technical deficiencies prior to the entry of final judgment. 41 U.S.C. § 605(c)(6).

### 2. Impasse Requirement

Medina's second argument against the formation of a claim raises a novel issue of law in this Court as to whether an impasse may be reached without negotiations, if such settlement discussions are prohibited by statute and regulation.

Medina submitted its TSP to the government on June 24, 1994. Pursuant to the FAR, an audit was undertaken and completed on or about April 15, 1996. 48 C.F.R. § 49.107(a). Consistent with the purposes of the CDA, upon receipt of a TSP, the CO is obligated to promptly negotiate the contractor's proposal with a view toward entering into a settlement agreement. 48 C.F.R. § 49.105(a)(3). Medina requested settlement negotiations on numerous occasions but was

9. Specifically, the certification executed by Mr. Owen Crossan provided that:

> The proposed settlement ... and supporting schedules and explanations have been prepared from the books of account and records of the Contractor in accordance with recognized commercial accounting practices; they include only those charges allocable to the terminated portion of this contract; they have been prepared with knowledge that they will or may, be used directly or indirectly as the basis of settlement of a TSP or claim against an agency of the United States; and the charges as stated are fair and reasonable.

Def.'s App. at 10; *see* 48 C.F.R. § 53.301–1436.

10. Although the argument was not raised in this case, it is recognized that not every certification would bind the contractor. The desired deter-

rence of fraud may only be achieved if the certifying official has "overall responsibility for the conduct of the contractor's affairs." 48 C.F.R. § 33.207(c)(2)(ii); *Fischbach and Moore Int'l Corp.,* 987 F.2d at 765. Further the certifying official must be sufficiently involved in contract performance to inculpate the corporation for fraud. *Ingalls Shipbuilding, Inc. v. O'Keefe,* 986 F.2d 486, 491 (Fed.Cir.1993). In this case, the certification was executed by Mr. Owen Crossan, President of Medina Construction, Ltd. Based upon the facts of this case, Mr. Crossan appears to have had both primary responsibility for the execution of the contract as well as a physical presence at the location of the primary contract activity and involvement in day to day contract performance. There does not appear to be any question that Mr. Crossan was in a position to so bind the corporation. *Fischbach and Moore Int'l Corp.,* 987 F.2d at 763–65.

consistently rebuffed because the government claims it was investigating allegations that Medina had presented fraudulent invoices for payment. In explanation for the delay, the government points to those provisions which direct a CO who suspects fraud or other criminal conduct related to the settlement of a terminated contract to discontinue negotiations and report the facts under agency procedures. 48 C.F.R. §§ 33.209, 33.210, 49.106. The CDA affirms that any claim involving fraud is not to be administratively settled, compromised, paid, or otherwise adjusted. 41 U.S.C. § 605(a).[11] Thus, it appears that the same body of law which directs a CO to settle a TSP also prohibits negotiation under certain circumstances involving fraud.

Medina argues that a CDA claim never arose because the parties did not commence negotiations and therefore did not arrive at impasse. The government opposes this argument and asserts that negotiations were precluded in this case by the CDA and its implementing regulations. Notwithstanding the lack of negotiations, the government asserts that an impasse was arrived at upon Medina's explicit and implicit request for a final decision.

Impasse means deadlock or failure to resolve the dispute during the course of good faith negotiations. *Ellett*, 93 F.3d at 1544 (determining impasse arose after parties were unable to resolve differences despite ten months of negotiations). The term "impasse," however, should not be interpreted as a throwback to the requirement that a dispute must exist between the parties before a claim may arise. *Reflectone, Inc.*, 60 F.3d at 1579. Rather, "impasse" is a determination that resolution through continued negotiations is unlikely and therefore further discussion is likely to be unproductive. *See, e.g.,*

*Ellett*, 93 F.3d at 1544 (determining parties reached impasse after ten months of fruitless negotiations); *McDonnell Douglas Corp. v. United States*, 37 Fed.Cl. 285, 292 (1997) (holding that Court did not need evidence of negotiations to find impasse since any effort to settle TSP would be futile in light of CO's belief that contract had been properly terminated for default), *appeal docketed*, No. 98–5096 (Fed. Cir. April 8, 1998).

Under certain circumstances the absence of negotiations has been found to be, in and of itself, an impasse. *See Appeal of Central Envtl., Inc.*, ASBCA No. 51086, 98–2 B.C.A. ¶ 29,912, 1998 WL 419323 (July 23, 1998) (determining that impasse can also arise due to the passage of time without cooperation between the parties).[12] However, in light of the clear purpose behind the CDA to encourage settlement between the parties, the first step of the analysis is to determine whether resolution through negotiations is, in fact, unlikely.

### a. OSI's Investigation of Fraud Allegations Made Resolution Through Negotiations Unlikely

Relying heavily upon the ten months of fruitless negotiations which occurred in the *Ellett* case, the crux of Medina's argument is that a CDA claim did not arise in this action because negotiations were never commenced after its TSP was submitted to the CO. *See Ellett*, 93 F.3d at 1544.

■ In the absence of evidence to the contrary, it is presumed that the government carries out its duties in good faith. *Ed A. Wilson, Inc. v. General Servs. Admin.*, 126 F.3d 1406, 1410 (Fed.Cir.1997); *Ellett*, 93 F.3d at 1547; *Caldwell & Santmyer, Inc. v. Glickman*, 55 F.3d 1578, 1581 (Fed.Cir.1995).

11. The CDA provides, in relevant part, that:

> [a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the CO for a decision. This section shall not authorize any agency head to settle, compromise, pay, or otherwise adjust any claim involving fraud.

41 U.S.C. § 605(a). The FAR interprets this provision and admonishes the CO not "to decide or settle ... claims arising under or relating to a

contract subject to the [CDA] ... involving fraud." 48 C.F.R. § 33.210(b).

12. Through the CDA, Congress created parity in the jurisdiction of this Court and the Armed Services Board of Contract Appeals ("Board") for purposes of reviewing appeals from CO's decisions or resolving direct actions therefrom. 41 U.S.C. §§ 606, 609(a)(1); *Garrett v. General Electric Company*, 987 F.2d 747, 750 (Fed.Cir. 1993).

Plaintiff has not offered any grounds for a finding that the government acted otherwise.

The facts surrounding the government's handling of the investigation into the fraud allegations reveal that sometime before July 30, 1993 OSI determined the fraud allegations would not support a termination for default. Nevertheless, the investigation of Medina's allegedly fraudulent conduct continued without any indication of conclusion. So long as the fraud investigation was continuing, the CO was statutorily precluded from carrying out any action which would cause the claim to be administratively settled, compromised, paid, or otherwise adjusted. 41 U.S.C. § 605(a); 48 C.F.R. §§ 33.209, 33.210, 49.106. DOJ did not advise the CO that it would forgo the pursuit of fraud allegations against Medina due to jurisdictional problems until September 16, 1996. However, there is no indication that DOJ's decision not to continue the investigation had any effect upon the CO's efforts to pursue the fraud allegations.

The interests of judicial efficiency under the CDA would not be served if parties were forced, as a prerequisite to Court action, to merely go through the motions of negotiating a claim if a good faith settlement appeared impossible. *See McDonnell Douglas Corp.,* 37 Fed.Cl. at 292 ("[d]emand for termination for convenience relief from the CO who terminated the contract for default demonstrates an impasse"). To do so would cause a waste of the parties' time and resources.

It is concluded that under the circumstances presented in this case, negotiations with Medina would have been a fruitless exercise since the CO was expressly prohibited from settling the claim because of the outstanding, unproven allegations of fraud. 41 U.S.C. § 605(a); 48 C.F.R. § 33.210. Even if negotiations were commenced, the CO believed he was powerless to enter into a settlement with Medina. Accordingly, resolution of this matter through negotiations by the CO was most unlikely.

13. Notwithstanding Medina's argument to the contrary, prior to the commencement of litigation there is no inconsistency between asserting a CDA claim and the expressed desire to continue to work toward administrative settlement. *Hamza,* 31 Fed.Cl. at 322; *Transamerica,* 973 F.2d at

### b. Medina's Request for a Final Decision

Further discussion or, in the absence of negotiations, continuing to wait for settlement discussions to commence, would be unproductive if the contractor indicated that he was ready to convert the TSP to a claim with a view toward obtaining a final decision and if the result was not favorable, then would submit the matter to either the Board or this Court.[13] The fact that a claim has arisen is traditionally signaled by the contractor's request for the CO's final decision upon the matter. *Ellett,* 93 F.3d at 1544 ("after ... fruitless negotiations, Ellett explicitly requested the ... [CO] settle its claim."); *cf. Braughler Co., Inc.,* 127 F.3d at 1478 (holding claim does not arise if no request for final decision from CO).

A request for final decision was both explicitly and implicitly requested by Medina in the August 26, 1996 facsimile, authored by Mr. Crossan, which stated in relevant part: "[w]e herewith demand your final decision on the payment of our Invoice submitted ... in April 1996." Def.'s App. at 84. In addition, plaintiff sent two follow-up letters, dated October 22, 1996 and November 14, 1996, which made further reference to the August 26 letter and reiterated Medina's request for a final decision. With regard to this correspondence, Medina argues that its efforts to trigger negotiations were misconstrued. Further, Medina argues that it never sought to pursue a remedy under the disputes process. That argument is unpersuasive in light of the contractor's own actions.

█ It is well settled that there is no requirement for any particular language or conformity to any specific format in order to state a claim pursuant to the CDA. *Transamerica,* 973 F.2d at 1578 ("'magic words' need not be used ... [rather,] the intent of the 'claim' governs") (citation omitted); *Heyl & Patterson, Inc.,* 986 F.2d at 483 (finding

1579. The CDA procedures requiring a claim and a CO's final decision upon the claim were intended by Congress to promote settlements and judicial efficiency. *Oroville–Tonasket,* 33 Fed.Cl. at 23.

that request for final decision can be implied from context of submission). "All that is required is that the contractor submit in writing to the ... [CO] a clear and unequivocal statement that gives the ... [CO] adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). In certain circumstances, even "a series of letters can be read together to comprise a clear and unequivocal statement giving the CO notice of the basis for the contractor's claim." *Kalamazoo Contractors, Inc. v. United States*, 37 Fed.Cl. 362, 368 (1997) (citation omitted). However, a reasonable contractor is not expected to submit a letter to a CO expressly requesting a final decision and insisting that interest begin to accrue unless a claim is the desired result.

In addition to Medina's express demand for a "final decision," the August 26, 1996 facsimile also sought the accrual of interest. Pursuant to the CDA, interest does not accrue upon settlement funds but rather is calculated upon the ripening of a TSP into a claim.[14] 41 U.S.C. § 611 (allowing interest to contractors commencing from date claim is submitted); *see* 48 C.F.R. § 49.112–2(d) (precluding government from paying interest upon amount due pursuant to a settlement but permitting interest from date claim is submitted).

Further, Medina commenced an action in the Portuguese Tribunal based upon the very same circumstances which led to the TSP and seeking payment of the very funds claimed in the TSP. Litigation in another forum, and an attempt to circumvent the CDA, is not indicative of an interest in negotiating a settlement. *See Burnside–Ott Aviation Training Ctr. v. Dalton*, 107 F.3d 854, 858 (Fed.Cir.1997) ("any attempt to deprive the Board [or Court of Federal Claims] of power to hear a contract dispute that other-

wise·falls under the CDA conflicts with the normal *de novo* review mandated by the CDA and subverts the purpose of the CDA.").

Medina's stance in the August 26, 1996 facsimile requesting a final decision imposed an ultimatum upon the CO to elect either to accept or deny the contractor's TSP. Notwithstanding the express request for a final decision in this case, such an ultimatum was indicative of a request that the CO issue a unilateral settlement decision. In short, Medina manifested an apparent desire to have the TSP converted to a CDA claim. Protestations to the contrary are belied by Medina's own actions. Accordingly, based upon the litigation upon the same facts and circumstances commenced in Portugal, the express request for the accrual of interest, and the plaintiff's express request for a "final decision," the August 26, 1996 facsimile must be interpreted as both an explicit and implicit demand for a final decision.

### c. Impasse Was Reached

■ Therefore, based upon the facts of this case, Medina and the government appear to have arrived at impasse without actually entering into negotiations. The passage of time without resolution can constitute an impasse when one party evidences a desire to begin the disputes process. *Central Envtl., supra*. After over two years of investigation, the CO still believed he was statutorily precluded from settling the claim and therefore refused to negotiate with Medina. In correspondence exchanged between the parties, the government consistently rejected Medina's requests to negotiate the settlement proposal. The government concedes that "the Air Force was not going to negotiate, much less settle the TSP, because of the pending fraud investigation involving Medina." Def.'s Supplemental Br. on Ct.'s Jurisdiction

---

14. Medina claims for the first time in its motion upon jurisdiction that its request for interest was not made under the CDA, but was pursuant to the Prompt Payment Act ("PPA"), 31 U.S.C. §§ 3901–3907. The PPA allows a party to recover interest from a government agency when payment upon a sum determined to be due and owing is overdue. The PPA is inappropriate in this case however because the payment in ques-

tion is disputed. *L & A Jackson Enter. v. United States*, 38 Fed.Cl. 22, 44–45 (1997), *aff'd*, 135 F.3d 776 (Fed.Cir.1998). Claims for money which are in dispute are expressly excluded from interest payments under the PPA and instead are subject to the CDA. 31 U.S.C. § 3907(c); *L & A Jackson Enter.*, 38 Fed.Cl. at 45; *CPT Corp. v. United States*, 25 Cl.Ct. 451, 455 (1992).

("Def.'s Br.") at 14. Moreover, it is unclear from the facts presented when the fraud investigation would have ended, if at all.

Faced with the government's intention not to negotiate the proposal for an indefinite time period and the passage of over two years, a substantial amount of time to wait for settlement negotiations to begin, an impasse arose when the contractor requested the CO to make a final decision upon the TSP. *Ellett*, 93 F.3d at 1544; *Central Envtl., supra.* Under these circumstances the parties reached impasse without negotiations based upon Medina's request for a final decision nearly twenty-six months after the submission of the TSP on June 24, 1994 and four months after the audit was completed.

Accordingly, it is concluded from the undisputed facts that the parties reached an impasse, and the certified TSP ripened into a certified CDA claim, on August 26, 1996 when the contractor made an unequivocal request for a final decision.

### B. Contracting Officer's Decision Was Invalid

Notwithstanding the determination that a CDA claim arose under these facts, jurisdiction is lacking because there was neither a valid CO's decision nor a legitimate deemed denial decision upon the contractor's claim under 41 U.S.C. § 605(a); *Braughler Co., Inc.*, 127 F.3d at 1480; *Ellett*, 93 F.3d at 1541–42; *cf. Case, Inc. v. United States*, 88 F.3d 1004, 1009 (Fed.Cir.1996) (articulating that an invalid CO's decision may not stand as the jurisdictional basis for CDA claim). "Under the CDA, a final decision by the . . . [CO], whatever the form, is a prerequisite for placing claims before the [C]ourt; without a final decision, the [C]ourt's jurisdiction over the case never vests." *Cincinnati Elec.*

*Corp. v. United States*, 32 Fed.Cl. 496, 501 (1994) (citations omitted).

### 1. Contracting Officer's Final Decision was Precluded by Statute

The contract clearly memorialized the parties' agreement to resolve disputes under and related to the contract pursuant to CDA. *See* 48 C.F.R. § 52.233–1 (disputes clause). Nevertheless, plaintiff insists that this case is properly venued in Portugal rather than with this Court or the Board.

No decision is reached as to whether the Portuguese Court in which Medina first commenced its action has jurisdiction over this matter.[15] However, presuming that the Portuguese Tribunal finds that it has jurisdiction, Medina's action in this Court would be precluded by several statutes.

### a. Preclusion Pursuant to 28 U.S.C. §§ 516—520

"Except as otherwise authorized by law, the conduct of litigation in which the United States, [or] an agency . . . is a party . . . and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General." 28 U.S.C. §§ 516. The responsibility of the Department of Justice ("DOJ") extends to defending litigation against the United States in both domestic and foreign Courts. 32 C.F.R. § 516.4 (1998).

Under this statute, once an action is commenced in a Court with appropriate jurisdiction, DOJ gains exclusive authority to act in the pending litigation and divests the CO of authority to act in the matter. *See Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1572 (Fed.Cir.1993) (holding that claim in this Court precluded contracting officer's

---

**15.** Plaintiff argues that the United States may be sued under certain circumstances in Portugal pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602. Having filed a complaint in Portugal, a conference was scheduled before the Praia da Vitoria Court on February 17, 1999 for the purpose of "attempting a conciliation between the parties . . . in order to clarify and define the terms of the dispute, discuss the dilatory pleas raised, deliver judgment disposing of the procedural issues, assess the uncontested material facts and establish the measures of inquiry,

indicate the evidence, suggest a date for the final hearing." *See* Supplemental Information Regarding Plaintiff's Motion for Stay. The discussions were also apparently intended to address the arguments made by the United States regarding jurisdiction and competency of the Portuguese Court to determine this matter. This Court has not been informed whether the Praia da Vitoria Court has yet made any determination regarding jurisdiction over the United States as a defendant.

authority to issue final decision on same claim), *overruled on other grounds by Reflectone, Inc. v. Dalton,* 60 F.3d 1572 (Fed.Cir. 1995); *Al Munford, Inc. v. United States,* 30 Fed.Cl. 185, 190 (1993) (asserting that CO had no authority to act on plaintiff's claim while same claim was pending in district Court). This policy facilitates the resolution of cases by ensuring the United States the ability to speak with one voice on behalf of the common interests of the Government without being influenced by parochial interests of a particular agency. *See United States v. Providence Journal Co.,* 485 U.S. 693, 706, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988) (interpreting 28 U.S.C. §§ 516 and 518(a)).

Based upon the potentially over-inclusive scope of 28 U.S.C. §§ 516—520, the law has been "narrowly construed" in this Court. *Hughes Aircraft Co. v. United States,* 534 F.2d 889, 901, 209 Ct.Cl. 446, 465 (1976). Specifically, the pendency of an action in this Court over one aspect of claim does not bar the CO from issuing a final decision regarding a separate claim in the same matter. *Case, Inc.,* 88 F.3d at 1010 (holding jurisdiction was appropriate based upon fact that two cases arose from same set of facts and circumstances "[did] not alter fact that the two cases involved different claims"); *McDonnell Douglas Corp.,* 37 Fed.Cl. at 291 (permitting CO to issue final decision upon claim based upon termination for convenience although complaint had already been filed with Court based upon termination for default); *Cincinnati Elec. Corp.,* 32 Fed.Cl. at 500 (permitting jurisdiction over claim submitted to CO which was different than claim pending before Court although both claims arose from the same facts and circumstances).

▮ However, in this case the litigation in the Portuguese Court was commenced upon the very same causes of action and sought the same damages against the government as the issues raised in Medina's TSP and subsequent claim. The complaint filed in Portugal specifically alleged that based upon the termination for convenience Medina was entitled to recover the amount of the TSP which was claimed to be due and owing from the government.

Therefore, by commencing litigation upon this claim in Portugal, Medina caused a shift in control of the government's interests from the CO to DOJ. *Sharman,* 2 F.3d at 1571–72. Approximately four months after DOJ was summoned to defend the United States, the CO issued a final decision dated March 26, 1997. Contractors are not permitted to unilaterally preclude the CO from issuing a final decision simply by filing a jurisdictionally defective suit. *Id.* at 1576 (Schall, J., dissenting). However, assuming that jurisdiction was appropriate in the Portuguese tribunal, the CO was not authorized to issue a determination upon the TSP. *See Cincinnati Elec. Co.,* 32 Fed.Cl. at 500 ("if a claim is in litigation ... the CO is without authority to issue a final decision on the claim."). Therefore, if jurisdiction exists in Portugal, and there is, as yet no ruling that it does not, the CO's final decision would be invalid. *Sharman,* 2 F.3d at 1571–72; *Durable Metal Prods., Inc. v. United States,* 21 Cl.Ct. 41, 46 (1990). Since an invalid CO's decision may not serve as the basis for a CDA action, jurisdiction in this Court would be lacking. *Ellett,* 93 F.3d at 1541–42; *Cincinnati Elec. Co.,* 32 Fed.Cl. at 501; *Sharman,* 2 F.3d at 1572; *cf. Case,* 88 F.3d at 1009.

### b. Preclusion Pursuant to 28 U.S.C. § 1500

▮ Further, pursuant to 28 U.S.C. § 1500, it has long been established that a plaintiff who has first commenced an action in another Court with jurisdiction over the matter is precluded from also litigating the action in this Court.[16] *See Allstate Fin. Corp. v. United States,* 29 Fed.Cl. 366, 369–

---

**16.** This statute was first enacted in 1868 then revised by § 154 of the Judicial Code of 1911 and finally codified in modern day in 28 U.S.C. § 1500. The statute provides:

The United States Claims Court shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly under the authority of the United States.

28 U.S.C. § 1500 (1994).

70 (1993) (determining that plaintiff could not litigate in both Court of Federal Claims and District Courts for same relief based upon same operative facts merely because some claims filed in District Court could not be filed in Court of Federal Claims); *cf. Hardwick Bros. Co. II v. United States*, 72 F.3d 883, 886 (1995) (remanding case because later-filed District Court action does not divest Court of Federal Claims of jurisdiction that was earlier properly established).

Although there is controversy concerning the necessity to retain § 1500 in modern times, this statutory provision has not been revised or eliminated by Congress and it must be applied where applicable. *Keene Corp. v. United States*, 508 U.S. 200, 217, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (explaining that judiciary may not override statutory limitation of jurisdiction of Court of Federal Claims); *National Union Fire Ins. Co. v. United States*, 19 Cl.Ct. 188, 190 (1989) (concluding that absent legislative repeal of the statute, plaintiffs must comply with § 1500 by electing a forum, sometimes at their own risk).

■ The issue of whether the jurisdictional bar of 28 U.S.C. § 1500 extends to actions which have first been commenced in the Courts of a foreign nation appears not to have been resolved as yet. *But see Rovina v. United States*, 10 Cl.Ct. 634, 640 n. 2 (1986) (leaving issue "for another day" since neither party had raised or argued the point); *Oakland Truck Sales, Inc. v. United States*, 149 F.Supp. 902, 138 Ct.Cl. 63 (1957) (holding statute inapplicable in situation in which action in Germany was only against German company and action in Claims Court was only against U.S. government).

Pursuant to the traditional jurisdictional inquiry under 28 U.S.C. § 1500, the first step is to compare the claims raised in this Court with those asserted in the litigation in Portugal. *Keene Corp.*, 508 U.S. at 210, 113 S.Ct. 2035 (holding 28 U.S.C. § 1500 barred action in Court of Federal Claims if same facts were asserted in the action first filed in a District Court having jurisdiction over the matter). If the suits are based upon the same operative facts and the relief sought is identical, then the claim is jurisdictionally barred

in the Court of Federal Claims. *Loveladies Harbor v. United States*, 27 F.3d 1545, 1551 (Fed.Cir.1994) (developing working definition of meaning of "claim" for purposes of applying 28 U.S.C. § 1500); *Marshall Associated Contractors, Inc. v. United States*, 31 Fed.Cl. 809, 813 (1994).

Plaintiff concedes that the same issues pending in Portuguese Court are at issue in this action. Compl. ¶ 1. This Court's independent inquiry reveals that both cases arise from the same underlying facts and circumstances, specifically the contract to build the Joint Use hangar, the subsequent termination of same and the alleged refusal of the defendant to pay amounts plaintiff asserts are owed pursuant to the TSP. Further, the relief sought in this Court is identical to the relief sought in the Portuguese action. Both actions seek damages amounting to $1,718,-230.05 plus interest.

The operative facts and the request for relief before the Portuguese court and the Court of Federal Claims therefore meet the similar claims test of 28 U.S.C. § 1500. *Loveladies*, 27 F.3d at 1551; *Keene Corp.*, 508 U.S. at 210, 113 S.Ct. 2035. Accordingly, presuming that jurisdiction exists in the Portuguese Tribunal, this Court is precluded from asserting jurisdiction over the matter by 28 U.S.C. § 1500.

### 2. Contracting Officer's Decision Based Upon Fraud Was Invalid

■ If it were concluded that the Portuguese Tribunal did not have jurisdiction over the matter filed by plaintiff, such that application of 28 U.S.C. §§ 516–520 and 28 U.S.C. § 1500 would not serve to deprive this Court of jurisdiction, there still remains a problem with the validity of the CO's final decision. An invalid CO's decision cannot support jurisdiction in this Court pursuant to the CDA. *Ellett*, 93 F.3d at 1541–42.

The CO's final decision upon Medina's TSP, dated March 26, 1996 stated in pertinent part:

1. In reference to your termination settlement claim regarding subject contract, this is to advise you to [sic] the following:

(a) In the course of processing ... [the] termination claim and in reviewing the contract files, documents and information were discovered indicating ... that ... [Medina] submitted apparently fraudulent invoices. The government subsequently paid on these invoices.

(b) At issue are invoice numbers 6122–002, 6261–001, 6261–002, 6265–001, and 6275–001. These invoices, submitted to the government and paid, represent a difference of $237,980.00 between the actual material costs (as listed by ... [Medina's] supplier) and the amount of the invoices.

2. Since you submitted apparently fraudulent invoices, you are in breach of the contract and are thus not entitled to the additional payments you seek under the Contract....

3. Since you submitted apparently fraudulent invoices, your claim is subject to forfeiture under the Forfeiture of Claims Act, 28 U.S.C. § 2514.

4. Your termination for convenience claim is thus not payable as a result of breach of contract and forfeiture. Your proposal is also unsupported. An audit of your termination for convenience settlement proposal found that Medina Construction LTD [sic] failed to maintain a General Ledger and associated subsidiary ledgers.... The audit stated "documentation and explanations provided in support of amounts presented in the settlement proposal were generally insufficient to provide reasonable assurance that the Proposed Costs are free of material misstatement."

\* \* \*

Based on these findings, I am unable to determine that any costs incurred by the Contractor are supportable.

Pl.'s Br. at Ex. D.

■ Fraud suits are usually initiated by the United States in district courts. *Hicks v. United States*, 23 Cl.Ct. 647, 653 (1991) (holding that fraud claims sound in tort and therefore, are "redressable, if at all, in district court"); *Degenaars, Co. v. United States*, 2 Cl.Ct. 482, 490 n. 6 (1983) ("[p]ursuant to ...

the 'False Claims Act,' jurisdiction for fraud against the United States lies in the District Court"); *see also LeBlanc v. United States*, 50 F.3d 1025, 1031 (Fed.Cir.1995) (holding that *qui tam* suits, a type of fraud action asserted under False Claims Act, may only be heard in district court). Only if there exists a suit filed by a contractor over which this Court has jurisdiction can the government bring a fraud claim before this Court by way of counterclaims pursuant to 28 U.S.C. §§ 1503, 2508. *Cherry Cotton Mills, Inc. v. United States*, 327 U.S. 536, 539, 66 S.Ct. 729, 90 L.Ed. 835 (1946); *Martin J. Simko Constr., Inc. v. United States*, 852 F.2d 540–41 (Fed.Cir.1988).

■ Further, the clear statutory language of the CDA specifically removes issues of fraud from administrative consideration. 41 U.S.C. § 605(a). Pursuant to the FAR, the suspicion of fraud is considered to be of such a sensitive nature that COs are specifically admonished not "to decide or settle ... claims arising under or relating to a contract subject to the [CDA] ... involving fraud." 48 C.F.R. § 33.210(b). Even "[i]f the [CO] suspects fraud ... related to the settlement of a terminated contract, the [CO is directed to] ... discontinue negotiations and report the facts under agency procedures." 48 C.F.R. § 49.106; *see also* 48 C.F.R. § 33.209.

OSI determined that the fraud allegations raised against Medina would not support a default termination. *See Joseph Morton Co. v. United States*, 757 F.2d 1273, 1278–79 (Fed.Cir.1985) (proof of fraud by clear and convincing evidence would provide a basis for default termination). Again in July 1996, OSI determined that it would not pursue prosecution of the fraud allegations. However, the government does not deny that, notwithstanding OSI's determinations, the CO persisted in his belief that Medina had committed fraud in the submission of certain payment invoices. The language in paragraph two of the final decision makes clear that the CO impermissibly based his determination that Medina had breached the contract upon his concerns surrounding the "apparently fraudulent invoices."

The government argues the CO's final decision to deny the contractor's TSP should be

considered valid because notwithstanding the apparent reliance upon fraud, the final decision contains an independent basis for denial premised upon Medina's failure to support its costs. *See Daff v. United States,* 78 F.3d 1566, 1572 (Fed.Cir.1996) (determining CO's final decision which claimed both failure to provide conforming goods and mentioned fraud allegations was valid because it was not based entirely on fraud). As evidence of the validity of the CO's concerns regarding Medina's ability to support its costs, the government points to the certification contained on SF1436 and Owen Crossan's affirmation that the TSP was "prepared from the books of account and records ... in accordance with commercial accounting practices." Def.'s Br. at 18–19; Def.'s App. at 10. The government argues that since Medina allegedly failed to maintain a General Ledger and subsidiary ledgers the CO had cause to be concerned about Medina's ability to support its costs. In the letter advising Medina of the final decision, the CO quoted the CAC audit report in which the auditor voiced concerns that the TSP may contain a "material misstatement" of costs. Pl.'s Br. at Ex. D.

Even if the CO's final decision is read in the broadest possible light, the government has not established that the CO incorporated a reason, separate and distinct from the fraud allegations, for the denial of Medina's TSP which would form a basis for its validity and thereby support this Court's jurisdiction. *Cf. Daff,* 78 F.3d at 1572. Pursuant to the FAR, in addition to being specifically precluded from deciding or settling claims involving fraud, "[i]f the contractor is unable to support any part of the claim and there is evidence that the inability is attributable to misrepresentation of fact or to fraud on the part of the contractor, the CO shall refer the matter to the agency official responsible for investigating fraud." 48 C.F.R. § 33.209; 48 C.F.R. § 33.210. It is apparent from the CO's final decision letter that the predominant basis for the assertion that Medina failed to support the costs submitted in the TSP was the CO's as yet unsubstantiated suspicion that fraudulent invoices had been submitted for payment. Although specifically precluded from determining claims involving fraud through administrative channels, the CO proceeded to deny Medina's claim based upon unproved allegations of fraud. Thus, the CO's final decision was unauthorized and invalid. Without a valid final decision, this Court cannot assume jurisdiction over this contract claim. *Ellett,* 93 F.3d at 1541–42; *Sharman,* 2 F.3d at 1568; *cf. Daff,* 78 F.3d at 1571.

## C. Jurisdiction Over Plaintiff's Additional Causes of Action

Under the Rules of the Court of Federal Claims ("RCFC"), whenever it appears by suggestion of the parties or otherwise, that the Court of Federal Claims lacks jurisdiction of the subject matter, the Court is obligated to dismiss the action. RCFC 12(h)(3)(1992). This rule applies regardless of whether jurisdictional issues are first raised by the parties or the Court. *Hambsch v. United States,* 857 F.2d 763, 764–65 (Fed.Cir.1988) (asserting that Courts must determine jurisdiction for themselves, raising the issue *sua sponte* if necessary); *Cupey Bajo Nursing Home, Inc. v. United States,* 36 Fed.Cl. 122, 132 n. 19 (1996) (determining Court did not have jurisdiction over certain claims pursuant to CDA).

The issue in determining whether to dismiss a cause of action based upon this Court's lack of jurisdiction is not whether a plaintiff will ultimately prevail but "whether the claimant is entitled to offer evidence to support the claim." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed. Cir.1988). If it appears, upon construing the allegations in the complaint favorably to the pleader, that plaintiff can prove no set of facts which would entitle him to relief the complaint must be dismissed. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683; *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### 1. Administrative Procedure Act

Plaintiff's complaint contests the government's debarment of Medina and Mr. Owen

Crossan individually on March 6, 1997. Debarment is an administrative procedure which has the effect of making Medina and Mr. Crossan ineligible for certain contracts in the future. 48 C.F.R. § 9.405. Medina alleges that pursuant to the Administrative Procedure Act ("APA") the debarment was arbitrary, capricious and carried out in bad faith. As a result of the debarment Medina claims to have "been damaged in their business, property and reputation [in an amount] estimated to be at least one million dollars." Compl. at ¶ 69.

 Plaintiff's claim for relief in this Court is misplaced. The APA specifically provides for judicial review of agency decisions which are alleged to be arbitrary and capricious, an abuse of discretion, unsupported by substantial evidence or unwarranted by their facts. 5 U.S.C. §§ 551–559, 701–706. However, the APA may not form the basis for jurisdiction in this Court for claims seeking monetary damages. *Union Bank and Trust Co. v. United States*, 27 Fed.Cl. 403, 404 (1992), *aff'd*, 6 F.3d 788 (Fed.Cir. 1993); *Berry v. United States*, 27 Fed.Cl. 96, 102–103 (1992). Furthermore, as a general rule, "[t]he Tucker Act does not give the Court jurisdiction to review the propriety of an agency's decision to debar a contractor ... such a challenge must be brought in District Court under the Administrative Procedures Act." *IMCO, Inc. v. United States*, 97 F.3d 1422, 1425 (Fed.Cir.1996) (citations omitted).

 Jurisdiction in this Court to consider an agency decision to debar a contractor has so far been found appropriate, within carefully defined limits, only in the context of affording complete relief in bid protest claims. *See ATL, Inc. v. United States*, 736 F.2d 677, 682 (Fed.Cir.1984); *Sterlingwear of Boston, Inc. v. United States*, 11 Cl.Ct. 517, 521 (1987); *Related Industries, Inc. v. United States*, 2 Cl.Ct. 517, 524–25 (1983).

 In order to successfully raise the debarment issue in this Court, Medina must be able to demonstrate that it has been damaged in some way related to the contract. "[I]f the debarment cannot be fairly viewed as an administrative event which was con-

nected to, or impacted upon, the government's consideration of the plaintiff's bid, then that jurisdiction which was fully established at the time plaintiffs filed suit would not encompass a review of any aspect of the debarment itself or the debarment proceeding in particular." *Sterlingwear*, 11 Cl.Ct. at 521.

In this case, however, the debarment did not interfere with the contract at issue, rather, it only serves to preclude future contracts, not at issue in this case. Accordingly, without considering the merits of Medina's debarment, the Court must dismiss the issue as a matter of law pursuant to RCFC 12(b)(1).

### 2. *Quantum Meruit*

 As a general rule claims sounding in *quantum meruit* are outside the scope of this Court's jurisdiction. The Tucker Act does not give a right of action against the United States in those cases in which, were the transaction between private parties, recovery could be had upon a contract implied-in-law. *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 69 L.Ed. 643 (1925); *Wells Fargo Bank, N.A. v. United States*, 26 Cl.Ct. 805, 817 (1992), *aff'd*, 88 F.3d 1012 (Fed.Cir.), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997); *Dolmatch Group, Ltd. v. United States*, 40 Fed.Cl. 431, 435 (1998); *Hoch v. United States*, 31 Fed.Cl. 111, 114 (1994).

Plaintiff's complains specifically that "[t]he Government has failed to pay for the value of the work performed and the expenses incurred by Medina on behalf of the Government or as a result of the Government's actions." Compl. ¶ 72. "To the extent that [Medina's] theory is based on a theory of unjust enrichment, that doctrine assumes the existence of a contract implied-in-law. This [C]ourt would have no jurisdiction over such a claim." *Glopak Corp. v. United States*, 12 Cl.Ct. 96, 104 n. 6 (1987), *aff'd*, 851 F.2d 334 (Fed.Cir.1988).

 Contracts which are implied-in-fact, however, may be within this Court's jurisdiction. *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983);

*Frank & Breslow LLP v. United States,* 43 Fed.Cl. 65 (1999) (suggesting jurisdiction may exist over *quantum meruit* claims based upon contracts which are implied-in-fact). However, the documents before the Court do not demonstrate "a meeting of the minds of the parties which is inferred from the parties' conduct such that a 'tacit understanding and agreement' was reached" as would demonstrate an implied-in-fact contract. *Wells Fargo Bank,* 26 Cl.Ct. at 817; *see also Hoch v. United States,* 31 Fed.Cl. 111, 114 (1994) (discussing difference between implied in fact contract and implied in law contract for purposes of *quantum meruit* ).

 Further, it is well established that an implied-in-fact contract cannot exist if an express contract already covers the same subject matter, unless the implied contract is entirely unrelated to the express contract. *See, e.g., Trauma Serv. Group v. United States,* 104 F.3d 1321, 1326 (Fed.Cir. 1997) (discussing definition of implied-in-fact contract); *Atlas Corp. v. United States,* 895 F.2d 745, 754 (Fed.Cir.1990) (explaining elements of implied-in-fact contract). In this action Medina seeks the same sums and alleges the same rights to the costs outlined in the TSP under the contract and upon a theory of implied-in-fact contract. However, there is no basis for plaintiffs assertion that an implied-in-fact contract existed, or if such a contract did arise, that it was entirely unrelated to the express contract between the parties. *Trauma Serv. Group,* 104 F.3d at 1326; *Atlas Corp.,* 895 F.2d at 754.

Moreover, even if Medina could support a *quantum meruit* claim under a theory of an implied-in-fact contract, Medina has not pleaded evidence that this cause of action was ever submitted to the CO for a final decision. 28 U.S.C. § 1491(a)(2); *see, e.g., A & S Council Oil Co., Inc. v. United States,* 56 F.3d 234, 241 (D.C.Cir.1995) (refusing to transfer causes of action inextricably related to contract under CDA to Court of Claims until administrative remedies had first been exhausted). Without a final decision, this Court lacks jurisdiction over those claims pursuant to the CDA. *Braughler Co., Inc.,* 127 F.3d at 1480; *Case,* 88 F.3d at 1009; *Ellett,* 93 F.3d at 1541–42; *Alaska Pulp*

*Corp. v. United States,* 38 Fed.Cl. 141, 145–46 (1997).

Accordingly, plaintiff's cause of action sounding in *quantum meruit* must be dismissed for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1). 28 U.S.C. § 1491(a)(1)(2).

### 3. Equal Protection/Due Process

Medina asserts it has suffered a violation of the right to equal protection pursuant to the Fifth Amendment. Specifically, plaintiff alleges that the government "failed and refused to apply Government procurement laws, to pay valid claims, debarred plaintiff and took other actions because of intentional or purposeful discrimination against the plaintiff and its principal based upon personal animus, national origin, and/or retaliatory motives." Compl. ¶ 80.

Also pursuant to the Fifth Amendment Medina alleges denial of its right to due process of law. Specifically plaintiff asserts that "delays in payment, the termination of the contract, the denial of the termination for convenience, costs and debarment,[sic] were done for an improper, arbitrary and capricious purpose or motive including ... personal animus and/or retaliation for Medina's exercise of legal and/or constitutional rights." Compl. ¶ 84.

 This Court lacks jurisdiction over causes of action alleging violations of the Fifth Amendment principles of due process or equal protection. *New York Power Authority v. United States,* 42 Fed.Cl. 795, 801 (1999); *see Bounds v. United States,* 1 Cl.Ct. 215, 216, *aff'd,* 723 F.2d 68 (Fed.Cir.1983) (equal protection clause); *Montalvo v. United States,* 231 Ct.Cl. 980, 982–83, 1982 WL 25825 (1982) (due process clause); *Carruth v. United States,* 627 F.2d 1068, 224 Ct.Cl. 422 (1980) (holding Court is without jurisdiction to hear claims based upon due process and equal protection under the Fifth Amendment).

Even if these causes of action were presented in a contractual context, Medina has produced no evidence that its causes of action seeking damages pursuant to theories of equal protection and due process were sub-

mitted to the CO for a final decision. *See A & S Council Oil Co., Inc.*, 56 F.3d at 241. Without a final decision, this Court would lack jurisdiction over the claims pursuant to the CDA. *Braughler*, 127 F.3d at 1480; *Case*, 88 F.3d at 1009; *Ellett*, 93 F.3d at 1541–42.

Accordingly, the causes of action sounding in equal protection and due process must also be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1).

### 4. First Amendment

Medina argues that the First Amendment permits individuals to petition for redress of grievances and that this right was violated because the government allegedly took actions to retaliate against plaintiff causing injury to both business and property. Compl. ¶¶ 90–96. It is unclear what damages are sought based upon this alleged infringement of Medina's rights.

▮▮▮▮ The limited jurisdiction of this Court, pursuant to the Tucker Act, requires that claims brought before this Court must seek money damages. *Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1007–08, 178 Ct.Cl. 599, 605 (1967). The First Amendment, standing alone, cannot be interpreted to command the payment of money for its asserted violation and therefore does not provide an independent basis for jurisdiction in this Court. *United States v. Connolly*, 716 F.2d 882, 886–87 (Fed.Cir.1983); *Calhoun v. United States*, 32 Fed.Cl. 400, 404 (1994), *aff'd*, 61 F.3d 918 (Fed.Cir.1995); *cf. Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989) (holding Court had jurisdiction to hear allegations of violation of First Amendment which were tied to valid claim for statutory back pay).

Accordingly, the causes of action asserting a violation of the First Amendment must also be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1).

### 5. Fifth Amendment Taking Claim

As it is money-mandating, the taking clause of the Fifth Amendment of the United States Constitution provides a basis of jurisdiction in this Court. Specifically, the provision disallows "private property [to] be taken for public use without just compensation." U.S. CONST. amend. V.[17] The purpose of the taking clause is "not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *First English Evangelical Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (emphasis added). In order to state a cause of action Medina must initially show standing, including proof of an ownership interest in the property at issue and that the United States interfered with the use of that property. *Id.*

Claims for interference with contractual rights generally give rise to a breach of contract claim and not a taking claim. *Sunrise Village Mobile Home Park v. United States*, 42 Fed.Cl. 392, 404 (1998); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 768–770, 572 F.2d 786 (1978). However, under certain circumstances the involvement of an express contract is not necessarily fatal to a taking claim. *Integrated Logistics Support Sys. Int'l, Inc. v. United States*, 42 Fed.Cl. 30, 34 (1998) ("taking claims are not presumed to be foreclosed by claims for breach of express contract merely because the claims share the same factual background").

▮▮ It is unlikely, but nevertheless possible that Medina might be able to establish facts sufficient to support a Fifth Amendment taking claim as an alternative to its contract claims against the government. *See Integrated Logistics*, 42 Fed.Cl. at 35 ("Because the court cannot conclude that the contract conferred expressly upon defendant rights of possession, use, ownership, and

**17.** The just compensation clause has been enforced outside the United States in situations in which the United States takes property. *See Porter v. United States*, 496, F.2d 583, 204 Ct.Cl. 355 (1974) (asserting that United States would be liable for taking foreign property); *Seery v. United States*, 127 F.Supp. 601, 130 Ct.Cl. 481 (1955) (holding that American citizen could state a cause of action for taking of real and personal property in Austria); *Turney v. United States*, 115 F.Supp. 457, 126 Ct.Cl. 202 (1953) (holding United States liable for taking property of alien corporation located in Phillipines).

alienation in the materials, and because plaintiff has alleged facts sufficient to support the converse ... does not preclude plaintiff from pleading a taking claim and breach of contract claim in the alternative.").

To the extent that Medina states a taking claim at all it is based upon rights in tangible and intangible property provided to complete the contract. Therefore, the taking claim is not independent of the contractual events also underlying its pleaded CDA claim. Further, this taking claim, as pleaded, arose as a result of the bilateral agreement between Medina and the government which provided for a means of dispute resolution under the CDA. *See A & S Council Oil Co.*, 56 F.3d at 241–42. The legislative intent of which is to promote economy, efficiency and effectiveness in the government's procurement of goods and services. *Id.; Pasteur*, 814 F.2d at 628. The CDA specifically insists that "[a]ll claims by a contractor against the government *relating to* a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (emphasis added). The parties agreed that "all disputes arising under or relating to" the contract would be resolved pursuant to the Disputes clause and the CDA. 48 C.F.R. § 52.233–1. Accordingly, Medina's taking claim for the value of property used to complete the contract is obviously directly related to its contract for the repair of the joint use hangar. *See A & S Council Oil Co.*, 56 F.3d at 241–42.

Medina has not produced any evidence that its pleaded taking claim was submitted to the CO or that any final decision on the claim exists. To the extent that a claim under a "takings" theory may lie against the government, under the circumstances presented here, Medina must first exhaust its administrative remedies under the CDA. 41 U.S.C. § 605(a); 28 U.S.C. § 1491(a)(2). Accordingly, the "taking" claim is not ripe for consideration under the procedure mandated by Congress for contract related claims and this Court is without jurisdiction. *See, e.g., A & S Council Oil Co.*, 56 F.3d at 241–42; *Alaska Pulp Corp.*, 38 Fed.Cl. at 145–46 (dismissing plaintiff's claim seeking declaration of parties's rights under land patent

pursuant to 28 U.S.C. § 1491(a)(2) since claim was not presented to the contracting officer for decision).

Accordingly, the "taking" cause of action must also be dismissed for lack of jurisdiction pursuant to RCFC 12(b)(1).

## 6. Claim for Attorneys Fees

Medina also requests attorneys fees, reciting without further explanation various provisions of law, including the Equal Access to Justice Act ("EAJA"). That statute provides in relevant part:

> Except as otherwise specifically provided by statute, a[C]ourt shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded ...

28 U.S.C. § 2412(d)(1)(A). Medina is not the prevailing party in this action. The complaint has been dismissed in its entirety based upon this Court's lack of jurisdiction. After consideration of the cited legal theories, it is determined that Medina has not pointed to any other statutory provision pursuant to which relief may be granted under these circumstances. Accordingly, Medina's request for attorneys fees pursuant to the EAJA must be denied.

## D. Defendant's Counterclaims

Defendant raised counterclaims against Medina sounding in the forfeiture statute, the anti-fraud provision of the CDA, and the False Claims Act. 28 U.S.C. § 2514; 41 U.S.C. § 604; 31 U.S.C. §§ 3729–31. This Court has jurisdiction over government counterclaims asserted pursuant to 28 U.S.C. § 1503 and 28 U.S.C. § 2508. *Simko*, 852 F.2d at 541. However, as a prerequisite for the exercise of counterclaim jurisdiction pursuant to 28 U.S.C. §§ 1503, 2308, a claim must be pleaded against the United States which is within the jurisdiction of this Court. *Daff*, 78 F.3d at 1573; *see Triton Group, Ltd. v. United States*, 10 Cl.Ct. 128, 134 (1986), *aff'd*, 818 F.2d 876 (Fed.Cir.1987).

Because the Court lacks jurisdiction over Medina's pleaded claims against the United States, the government's counterclaims must also be dismissed.

## II. Plaintiff's Motion for a Stay of Proceedings in this Court

 The power to stay proceedings is "incidental to the power inherent in every Court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936); *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341 (Fed.Cir.1983). Exercise of the power to stay an action is tantamount to exercising the Court's jurisdiction. *Cincinnati Elec. Corp.*, 32 Fed.Cl. at 505.

 Having determined that the Court lacks jurisdiction over plaintiff's complaint and the defendant's counterclaims jurisdiction is similarly lacking to grant the requested stay. *Dico Inc. v. United States*, 33 Fed. Cl. 1, 4 (1993), *aff'd*, 48 F.3d 1199 (Fed.Cir. 1995). Accordingly, without determining the merits of plaintiff's motion for a stay of this action pending the Portuguese Tribunal's determination as to its jurisdiction, plaintiff's motion for a stay of the action in this Court cannot be granted.

## CONCLUSION

Accordingly, based upon the foregoing, as jurisdiction is lacking over all pleaded claims and counterclaims, it is **ORDERED:**

(1) That final judgment be entered dismissing the complaint and counterclaims, without prejudice;

(2) Plaintiff's request for attorneys fees and costs is **DENIED;**

(3) Plaintiff's motion for a stay is **DISMISSED;**

(4) No costs.